Number 20-6013 Council, you may proceed. I believe Mr. Zeeman, you'll start us off, correct? Thank you, Your Honor. If it pleases the court, my name is Christian Zeeman. I represent the plaintiff, Dillian Burge. This case is fact-intensive, so I'm going to go through the facts. There are a lot of facts that are disputed, so I'm going to try my hardest to keep this argument well within the confines of what is not disputed. The plaintiff, Dillian Burge, who was a 17-year-old high school student at the time, visited a Wal-Mart to pick up snacks for a sleepover he was having with three of his friends. Upon his arrival, he witnessed an assault and battery occur on a female Wal-Mart employee for the window of his vehicle. After parking, he and his friends approached the entrance of the Wal-Mart where the altercation between the female employee and the assailant was continuing. At that time, a Wal-Mart supervisor by the name of Jason Overley approached to address the situation. It's important to note that Mr. Overley and other Wal-Mart employees were watching the altercation at its inception, witnessing a heated and loud argument between the female employee and the assailant, which was her husband. And most importantly, they witnessed the first assault and battery on the female employee, which occurred well prior to my client, Dillian Burge, approaching. At some point after Dillian arrived, words were exchanged from all persons, including the Wal-Mart employees. The assailant pulled a knife and plunged towards Jason Overley, who was the Wal-Mart associate. The assailant continued to swing his arm at other persons present, and his knife landed twice in Dillian's body, once in his lung and once in his liver. At that point, 911 was called and the assailant was apprehended approximately 2.5 minutes later. Let me stop you for a minute. Let me stop you for a minute. So have we skipped over the part about the Wal-Mart associates asking your client not to intervene? Or do you dispute that that ever happened? I dispute that it's relevant to a question of law. That is a question of fact as to whether or not I know that the appellee… No, I understand that, but you said it was important that we understood all the facts. I'm sorry. That you were going to give us the full bevy of facts, and it sounds like we're not getting the full factual background. Do you dispute that it happened, that they told him not to intervene? There's some testimony from the Wal-Mart employee, the female, who told him not to intervene in the situation. That is correct. Okay. And so just to be clear, I mean, you said there's some testimony about that. Does your client dispute that that happened? Or does he concede, do you concede that at least one Wal-Mart employee told your client not to intervene? I'm not disputing that that Wal-Mart employee did say that. Okay. Well, then why, if you don't dispute that, then why didn't that satisfy any duty that Wal-Mart had to Mr. Birch? The Wal-Mart employee told him to step back, was one of the people who was involved, was a victim of the assailant's assault and battery. At that point in time, my client, the question of whether my client was protecting or intended to protect the victim of the assault and battery was germane to his mind at the present time. And so he wasn't warned of a danger. He was warned by he was warned that there was actually no warning. There was a woman saying, step back from this situation. Mr. Zeeman, just to follow up on Judge Mathison's question, as I understood, and I thought it was undisputed, that there was a supervisory employee of Wal-Mart that told him, get back. And Mrs. Harjo told him to get back. Do you, do you, am I wrong about the former that, that apart from this, you're talking about Mrs. Harjo, but didn't also a supervisory employee. The supervisor, the supervisor employee that you're speaking of is Jason Overly. And whether or not he did or didn't, I think that may be a question of fact. I don't know if my, my client recalled exactly whether or not Mr. Overly told him to do that at the time. Well, if he did tell him to step back, back to Judge Mathison's question, even if Mrs. Harjo said wouldn't have satisfied Wal-Mart's duty, why wouldn't his instruction to step back? Why wouldn't that have satisfied Wal-Mart's duty? Well, I think at the point in time, the question is, is whether or not my client felt that he was providing protection to a female assailant that wasn't being provided by anybody. And it wasn't being provided by any Wal-Mart employees that were there. Not only was there no protection to this, to this female victim at the time, it was, it was being watched by Wal-Mart employees and no actions were being taken by them. How does he have standing to, to, to argue that, well, there was a duty not to him, any duty to him was satisfied to get him out of harm's way to step back. But Wal-Mart was violating a duty to Mrs. Harjo. Mrs. Harjo ironically says, I wasn't in harm's way. I was the wrongdoer, not Mr. Harjo. And so we have the sort of strange situation. I don't mean it pejoratively that Mr. Bray is saying that, well, I am entitled to recover because Wal-Mart violated a duty, not to me, but to Mrs. Harjo. And I'm not even sure he has standing with certain violation of the duty to Mrs. Harjo. Well, I think that the duty, the duty to protect goes to what is foreseeable, Your Honor. I think the duty of Wal-Mart to protect its customers is based upon what is foreseeable. This is an assault on a battery that occurred at an entrance of a Wal-Mart. Is it foreseeable that if Wal-Mart does nothing, that any patron, any person, any man, any woman, any customer may step in to try to stop an assault and battery? Many of us, many of us, not all, but many of us have been raised on the fact that you do not hit a woman. You do not allow that. You step in, you do the right thing, you try to protect others. And is it not foreseeable at an entrance of a Wal-Mart that a customer would do this? And if it is foreseeable that a customer may come in, not only in contact, but may act on that contact? Wouldn't the question be whether it was foreseeable that somebody would intervene in an altercation like this when they've been specifically instructed by Wal-Mart employees not to intervene? Well, at the time that this was occurring, the instruction that you speak of from Mr. Overley did not occur until the parties were all within arm's length and in the situation of danger. Even though Mr. Overley watched this from a vantage point for many minutes as it unfolded, knowing that not only that there was a dangerous situation and a heated argument, but also witnessing the initial crime itself of assault and battery. How much time passed between your client witnessing the altercation and him intervening? That would be around the same time that follows the same time. And I use the video surveillance. It appears roughly a five-minute period of time from the minute the altercation occurs. Now, when I talk about the altercation, that's between the assailant and the female Wal-Mart employee. When did your client see it? My client saw it. It's hard to say, but he saw it when the woman was first struck. And I don't have the exact minutes, but that was when they were in the vehicle and they saw the woman get hit by a man. I'm sorry. Yeah, I mean, I guess my question is, your position is we want to rely on the Wal-Mart employee watching everything unfold from first punch. And I just wonder if maybe that employee couldn't, on the counter to your argument, suggest that that employee was in a better position, having witnessed it from the beginning, to know that intervention was not going to de-escalate the situation. Well, Your Honor, that's a heavy question of fact that would need to be tried to the finders of fact as to whether or not that belief that he had. But what, in my mind, the question is, is what the supervisor saw. Did he see an assault battery and a crime that was being committed? This is an adult supervisor who's well aware of potential dangers that can occur on Wal-Mart premises. And when he saw this crime occur, was it his duty at that point in time to protect not only his employees, but the customers that would come into that foreseeable range of danger at the entrance of Wal-Mart? Counsel, other than Mr. Overly trying to discourage Mr. Burge from intervening, what should Wal-Mart have done in this circumstance? And what could they reasonably have done, given the timeline here? That's an excellent question, Your Honor. And with the timeline, it's a very, very simple answer, which goes to the crux of our defense and the crux of our placement of duty upon Wal-Mart. Upon seeing an assault battery, it is our contention that a reasonable person, a reasonable adult in that situation, would call the authorities 9-1-1. There's testimony from lower-level employees that there's an unwritten rule that they're not supposed to call 9-1-1. Well, but Counsel, would that have done anything to prevent the assault on your client, given the timing of all this? It would, Your Honor, from the time of 9-1-1 until the time that the person was apprehended. No, I'm not talking about when the person was apprehended. I'm talking about when he assaulted your client. That's correct, Your Honor. And at the five-minute mark, if 9-1-1 was called immediately at the time of the verbal altercation or the first assault and battery, then the police, not only would the police have shown up by then, but even the sound of the sirens and the lights may have very well deterred the assailant. Remember, from 9-1-1 until the time that he was apprehended was a two and a half minute, a very small window. The police were fantastic. And they're arriving at the scene and putting the assailant in handcuffs. Now, Your Honor, and I would contend that a lot of times you can stemming, and this is a question of fact for reasonable people may differ on this, but you can stem a lot of things by letting people know, I called the cops. 9-1-1 is called, cease and desist. That wasn't done in this situation. And under the law, it is our contention that there is a duty to protect, and it's a duty to protect not only the employees, but anybody who may come into that area. Let me ask you, Mr. Zeeman, I'm sorry to interrupt you, but as I understand it, in Oklahoma, the test to determine whether there is a duty and the scope of the duty comes from the Second Restatement of Courts, Section 344. And that was adopted, as I understand it, in Bray. I think you're talking about Spencer? I can't remember the name of the case. That that is the governing test. My understanding from my review of the law and from reviewing both briefs in this matter, the controlling case actually ended up being a Tenth Circuit case and actually ended up involving a Walmart case. Is Section 344 not the test to determine the scope of the duty to a stranger? If it's not, that's fine. I believed it to be the case law that addresses that under Spencer and then Taylor. The Spencer law, which the appellee cites, stands for the fact that an inviter generally does not have a legal duty to protect invitees from the criminal assaults of third parties. Right, and on page 197, Spencer adopts comment F to the Second Restatement of Courts, 344. Do you see that? Yes. Okay, and the comment F, and this is a rough paraphrase, says that the inviter, the landowner, owes a duty when there's an informational advantage. In other words, when the possessor of the land knows of a danger that is not likely to be known by the invitee. Correct? That's correct, Your Honor, and that footnote was also part of what I believe to be the Taylor v. Henson case. So what information was known about Mr. Fargo that was known to Walmart that was not known to Mr. Bray? Well, first off, as far as the Walmart employee herself that was the victim of the assailant, now there is question as to whether or not she started the fight or was the actual victim, and that's a question of fact for the jury. She knew that he, under your view of the facts, that he hit her. Correct? Well, not only that, Your Honor, she knew that she was hit. And Mr. Bray knew that. Yes. That's why he intervened. Okay, what else? Did Walmart know that he did not know? The associate knew that this was a dangerous man, and when I say dangerous, we're talking about a long list of felony convictions for assault and batteries, not on regular people, but on police officers. And we're not talking about fistfights, we're talking about use of machetes and use of weapons. The Mrs. Harjo, who was wearing her Walmart uniform at the time of this incident, knew of that well before that. She knew of that when this whole incident occurred. She knew that prior to her herself summoning this man to Walmart to come pick her up, which her testimony was is that she knew at the time that she was summoned, that she summoned him, that he was intoxicated. So we have that individual who has the knowledge, but also important to this case is the Jason Overley and the other employees who were watching an assault and battery. Like Mr. Bray. I mean, Mr. Overley didn't know anything that Mr. Bray didn't know. They were both observers. He wasn't an observer in a position of advantage, though, to be able to see that it was a heated oral argument that became physically violent. And Mr. Bray saw that. That's why he intervened. Right. So what it really boils down to, and I'll stop in just a second because I've taken away over time. So what your theory really is, is that that the informational advantage in common at the Section 344 is predicated on what an employee might know about the violent propensities of their spouse or significant other that would be chargeable to the employer. So, in other words, for example, if my wife were to violently attack the U.S. courts, there might be an argument that, well, the U.S. courts were were knowledgeable because Bob Bacharach knew that his wife was really dangerous. And I didn't alert the administrative office of the courts that my wife is really dangerous. In other words, that's what basis for the the informational advantage is, is that the employee knows the violent propensities of their spouse that would not be known to a stranger. Is that what it boils down to? Well, that's partial, Your Honor, because we have two players involved here. And when looking at the Taylor versus Henson case, which was a McDonald's case, the court narrowed out the exception that the inviter can be responsible and have a duty to protect when they know or, most importantly, have reason to know that the specific act or harm could occur. In that case, a McDonald's employee overheard and watched racial slurs occur in front of her at the register. She never witnessed an assault and battery. She never witnessed it go to the level of physical danger. A physical assault and battery occurred out in the parking lot. The Supreme Court found that there is a question of fact as to whether or not McDonald's had reason to know whether or not an assault and battery would occur. The facts in this case, in my opinion, point to a actual better set of facts for a plaintiff is that we had one person who one person at Walmart employee who knew that this person was very, very dangerous. Also, we had another employee, two other employees, actually, they're all watching who actually witnessed not just slurs, but witnessed an assault and battery occur. I appreciate your thorough answer. And I apologize for eating up your rebuttal to the panel for occupying so much of the court's time. All right. Thank you, Mr. Zeeman. Mr. Brewer, we we've gone over a little bit. And if you're we'll we'll give you a little extra time if you need it. But why don't you go ahead and proceed with your argument. Thank you. May it please the court. My name is Mike Brewer and I'm here on behalf of my client, Walmart stores is still paying the prevailing party in the trial for any appellee in this matter. We believe the primary issue for the court today is whether under the undisputed facts presented to the trial court, Walmart owed appellant Burge any duty to protect him from a third party criminal act in the parking lot of its store in Henson, it sets out the general rule in Oklahoma, that there is no liability for the acts of a third party criminal, no liability that goes to the landowner, there's a very specific exception lined out in Taylor v Henson, and it is if they have knowledge or reason to believe that the invitee is an imminent danger and imminent danger is a very important item here as we talk about the timeline of what occurred. Again, there was some reference here to the entrance of Walmart to be clear and it is in recognized by the trial court. This is on a sidewalk outside a Walmart store in the parking lot, where the third party actor Mr. Harjo pulled up in a car to pick up Mrs. Patricia Harjo, who was an hourly employee of Walmart, who was off the clock or can I just jump in here, I'd like to make sure we keep Taylor in the picture as you continue to make this point. Because you, you, you started with that and you're relying on that but why, why aren't the facts, stronger here for attribution of knowledge to Walmart, then, then they weren't Taylor, where the McDonald's manager there witnessed only verbal harassment but but here we have an assault. Your Honor, here is the trial court noted with Mrs. Harjo's testimony is that Mr. Harjo did not hit her she shoved him. There was a domestic dispute between a husband and wife that happened in the parking lot or on the front sidewalk of a Walmart. In this case, and the Taylor case one of the important things Judge Matheson is to understand. In 1993, not everyone had cell phones. The plaintiff in the customer who was begging the manager and Taylor versus Henson to call the police. The manager refused the McDonald's manager refused. That makes a big difference here there. The victim was because in 1993 versus 2017, we have a pretty disparate difference in cell phones and cell phone usage the ability to call for help and the police that victim asked the manager after witnessing three skinheads were verbally abusing racial slurs of customers the manager asked them to leave the premises. They simply moved out to the parking lot where apparently when this customer left was assaulted on her way out, but she begged the manager, please call the police and the manager said no let's wait and see how this plays out. That's the testimony and Taylor V Henson here, the idea of the imminent danger that comes from that Mr. Burge himself, who has been argued witness this assault and battery, he could have called 911 his two friends could have called 911. They obviously didn't think there was imminent danger. Well, counsel counsel didn't Mr. Overly radio, his manager about the altercation, doesn't that indicate there, there was some imminent danger here. Your Honor, we don't believe that domestic disputes in public equal imminent danger that doesn't equal a knife fight that doesn't equal something else that could, you know, speculate on what could happen. He radioed I believe the testimony was that he attempted to radio that there was something going on and he was going to go check on. He arrived at exactly the same time as Burge and his two companions. They arrive at this. Mrs. Harger had already asked Mr. Burge to walk away. The testimony that the trial court relied on is shown is a Mr. Overly testified that he asked Mr. Burge to walk away. Mr. Overly is actually standing between Mr. Burge and Mr. Harger. And when Mr. Burge, as the trial court notes disregards the two warnings to walk away the confrontation continued because he did not walk away. Mr. Overly is the first person that Mr. Harger tried tonight. This all occurs overly Burge and the knifing in 40 seconds, as a show and agreed by all the parties in the briefing and picked up by the trial court. So we do believe there's a big difference between the fact pattern set out by the Oklahoma Supreme Court and Taylor v. Henson in what plaintiff or appellee is arguing here. Additionally... Before we leave this particular point, when it comes to the district courts addressing the exception, the Taylor exception, did the district court require a showing that the stabbing itself was foreseeable? You seem to argue in your brief that the stabbing must have been foreseeable to Walmart. Is that your position? Our position is imminent danger. Imminent danger is the terms used in Taylor v. Henson. But what has to be foreseeable? Pardon? I'm sorry, Judge. What has to be foreseeable? The imminent danger that could occur to that third person. All right. And and didn't the district court say that the stabbing had to be foreseeable to Walmart? I believe the order. I'm sorry. I'm looking at it. It said that there was no inference that Walmart had reason to know that a stabbing would occur. We read that, Your Honor, as the court's view that because that's what happened here. That is, there was no other action, physical or otherwise, that involved Mr. Burge other than that. So that's that's the only reference point anyone has. Well, but wouldn't doesn't that doesn't that frame the exception too narrowly? In other words, I mean, other things could have happened besides a stabbing. And. I mean, there is there is a case law out of Oklahoma. I'm no one cited this, but I found a case brave versus St. John health system where it seems like the foreseeability is broader than than than requiring Walmart to foresee that there might be a stabbing. Well, Judge Mathison are directly answering your question. The foreseeability is to imminent danger here, like in the Bray case. There are issues where because of other crimes on the premises and other issues that might give knowledge to the landlord. They might expect that there's imminent danger and be on notice of imminent danger here. We believe the reference by the trial court isn't that had to be a knife. That's just what happened in the reference here by the trial court was simply because that's the fact pattern of this case. Is there any evidence in the record about this Walmart parking lot being a place where a lot of violent crime took place? No, Your Honor. Judge Carson, that was not presented in evidence in this case, and there was no evidence of prior problems with Mr. Harjo when he picked up his spouse either. So plaintiff did not present any of those sort of specific knowledge to the landlord because of prior acts and that sort of thing that I believe the Bray case helped. OK, so would you agree that if this were a case where there was a history of people congregating and getting in fights or place that had a history of, say, gang activity in the parking lot that Walmart may have had a duty to respond in that situation? But Judge Carson, that's a different situation because this was a domestic argument between a husband and wife. And if there's gang fights, criminal fights, things going on that are that the landlord is aware of, there have been reasons to involve law enforcement. So I do believe that's a different situation. In those situations, I do believe the answer may be different because of circumstantially based how you get to the exception to the rule, which is a rule of no liability. Let me ask you another question. Let me ask you another question about Taylor V. Henson. My recollection of that case is that the manager was contacted and they asked him to call the police or do something about it. But the manager testified that she was too busy to respond. Do you see that as a distinguishing factor in your case? Yes, yes, we do, Judge Carson, because here Mrs. Harjo did not ask for help. She did not ask for Mr. Burge to be her rescuer or protector. In fact, she asked him to walk away. He didn't. Mr. Overley asked him to walk away. He came in to check on the situation. Then Mr. Burge kept the confrontation continued as the trial court notes. But no, I do believe that is a significant distinction that makes our case not fall within the exception set forth. Would you, and I don't want to put words in your mouth, are you basically arguing that one of the distinguishing factors between Taylor in this case is that in Taylor, the person filing the complaint was the target of the violence that they wanted them to call on. And in this case, what you have is Mrs. Harjo was the target of the violence originally, and you had a sort of a gratuitous third party show up and intervene and then was injured. Yes, Judge Carson, we don't. The Oklahoma Supreme Court has not extended this duty to the protector, duty to the rescuer argument that the plaintiff has put forward here to the court. That has not been something that is established by the Oklahoma Supreme Court. They've not added this kind of zone of danger idea, zone of protection idea. Oklahoma does have a good Samaritan statute. It does not apply and specifically for first responder medical aid type things. So there is nothing in Oklahoma law that provides the duty that plaintiff seeks to impose here. In fact, in plaintiff's or Kelly's brief in chief, their article three or proposition three, they understand and set forth. We're asking the 10th Circuit to change Oklahoma law based on public policy. So they recognize that Oklahoma law is very clear on the situation like this and very narrow specific exception, because they in their own brief argue that this is asking that they're asking for a policy change. And we don't agree. We don't believe that Oklahoma law goes there. Can I just ask you to clarify one point. Are you suggesting that because this was a domestic altercation between the Harjo's that that for some reason that should be discounted as far as imminent danger is concerned. Can a domestic altercation just be as as dangerous or maybe even more dangerous than other types of altercations. It certainly can judge Mathison but under these circumstances, and we believe Taylor Henson is a very the exception stated there is a very specific factual circumstance related analysis. Under these circumstances, on the record presented. Everyone testified that they did not know about a knife, they never saw a knife. Nothing ever would have led that it was a domestic disturbance with a Pele bird saying he saw someone strike a female with the female who was allegedly stricken saying he never hit me I showed him. Yeah, she was mad there's no dispute that he appeared at the premises had done some damage to the car and she was angry so there was a domestic dispute but your honor. I don't know where you shop I don't know if you go to stores retail outlets, by any name or brand, you're likely to witness arguments between couples between spouses, where children are involved running around, trying to get things under control, those domestic disturbances or domestic arguments aren't dangerous. They don't lead someone to believe that they're going to be involved in a knife fight here, this domestic disturbance that the video that appellee relies on. There were multiple customers that walked by without doing anything without intervening without getting involved. And the fact that nobody on a Pele side of the three people involved called 911 they had no idea that was imminent danger. No one coming into this thought there was imminent danger. This hard Joe, who was the person you know who was allegedly being assaulted. She testified she had no idea where the knife came from it wasn't in the car when she was dropped off from work she had no idea her husband had it. She did not believe she was in an imminent danger, or she could have called 911 or left, left him. She chose to say, Mr. Burge walk away, and he didn't. And just as Mr. Overly did Mr overly put himself between Mr. Burge and Mr. Harder, and he was the first one that Mr. Harder charges staff at this, there was no indication to Walmart to the landlord care that this domestic disturbance or argument would lead to this kind of a violent human. And because of that we had to do. Further questions from the panel. Yeah. All right, well thank you Mr Brewer and thank you Mr Zeeman for the arguments this morning the case will be submitted counselor excused. Thank you. Thank you.